# In the United States Court of Federal Claims

No. 14-817C

Filed: August 18, 2022

---

**NORTHERN CALIFORNIA POWER AGENCY, et al.,**

           *Plaintiffs,*

v.

**THE UNITED STATES,**

           *Defendant.*

---

*Lisa Dowden* and *Jeffrey A. Schwarz,* Spiegel & McDiarmid LLP, Washington, D.C., for Plaintiffs.

*P. Davis Oliver*, Senior Trial Attorney, *Franklin E. White*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton,* Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    Liability is established in this illegal exaction case. Northern California Power Agency and the Cities of Redding, Roseville, and Santa Clara, California (referred to collectively as "NCPA") purchase hydroelectric power from the United States. They brought this action to recover overpayments they believed were assessed in violation of the Central Valley Project Improvement Act ("CVPIA"). The United States collected these overpayments under a revenue-maximizing payment scheme that assessed disproportionate payments to power customers as opposed to water customers. At trial in 2018, the Court[1] found the United States correctly interpreted the statute and that no overpayments existed. The Federal Circuit reversed, finding that the United States' practice to reach its collection target was, in fact, a violation of the CVPIA. *N. Cal. Power Agency v. United States*, 942 F.3d 1091 (Fed. Cir. 2019). The only question remaining before this Court queries the proper methodology to calculate damages.

    That question is purely legal. Before the Court are Cross-Motions for Summary Judgment. (Pls.' Mot. Summ. J, ECF No. 152; Def.'s Mot. Summ. J., ECF No. 153). Assessing specific damage calculation for illegal exactions generates more questions than answers. The

---

[1] *N. Cal. Power Agency v. United States*, 139 Fed. Cl. 74 (2018) (Wheeler, J.). Following remand, this case was transferred to the undersigned on December 3, 2019. (ECF No. 116).

parties agree that damages are the difference between what the United States actually charged and the proportional charges authorized by the CVPIA. (Nov. 1, 2021 Status Report at 6, ECF No. 146). Where their rationales diverge is how proportionality should be calculated. (*Id.* at 7). In the limbo between liability determination and this stage of litigation, the United States developed a new allocation methodology for calculating the types of payments overpaid by NCPA—one that ultimately reduces the United States' exposure. In fashioning this new allocation approach, the United States departed from the practice it utilized for decades, now maintaining that its longstanding approach is wrought with error. NCPA urges the Court to order the United States to make payments utilizing elements of the prior formula. After considering the relevant legislation and the basic principles of damages, the Court agrees with NCPA's proposed methodology. Therefore, NCPA's Motion for Summary Judgment is **GRANTED** and the United States' Motion for Summary Judgment is **DENIED**.

## I. Background

The remaining issue is narrow. However, the Court recounts some history of the aquatic plight of California's Central Valley and the relevant legislation to provide context. In 1935, Congress created the Central Valley Project ("CVP") to supply water to California farms and communities for agricultural, municipal, and industrial uses due to scarce water resources. Emergency Relief Appropriation Act of 1935, ch. 48, 49 Stat. 115, § 4. Extending 400 miles through central California, the CVP is an intricate, multi-purpose network of dams, reservoirs, canals, hydroelectric powerplants, and other facilities used to supply water and electrical power to the Greater Sacramento and San Francisco Bay areas. Central Valley Project, BUREAU OF RECLAMATION, https://www.usbr.gov/mp/cvp/index.html (last visited August 10, 2022).



*Northern California Power Agency, et al., v. United States, Case No. 14-817, Pls.' Mot. for Summ. J., A400, ECF No. 152-1 (colorized).*

In addition, the CVP provides water to restore and protect fish and wildlife, as well as to enhance water quality. *Id.* The Central Valley's need for water is significant—by some estimates, the region supplies eight percent of the United States' total agricultural output and one-quarter of the nation's food—but annual rainfall does not provide a reliable source of water for Central Valley farmers. California's Central Valley,

UNITED STATES GEOLOGICAL SURVEY, https://ca.water.usgs.gov/projects/central-valley/delta-eastside-streams.html (last visited August 10, 2022). Today, the CVP is the nation's largest federal water management project. *N. Cal. Power Agency*, 942 F.3d at 1092.

Congress passed the CVPIA in 1992 to "achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors." Central Valley Project Improvement Act (CVPIA), Pub. L. No. 102–575, § 3402, 106 Stat. 4600, 4706 (1992). Despite its solicitous intent, the CVP struggled with concerns about the project's costs and private benefits. Congress intended for the CVPIA to address the environmental impact of the CVP and allow changes in water policies, pricing, and distribution. Central Valley Project Improvement Act, WATER EDUCATION FOUNDATION, https://www.watereducation.org/aquapedia/central-valley-project-improvement-act (last visited July 14, 2022). The CVPIA mandates balancing competing demands for a limited supply of water, a balance that included meeting multi-purpose public requirements. *Id.*

Within the United States Department of Interior ("DOI"), the Bureau of Reclamation ("Reclamation") manages the CVP. *See* Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. 102–575, 106 Stat 4600 (1992). Along with distributing water to water customers, the CVP also generates hydroelectric power through dams and power plants built as part of the project. *N. Cal. Power Agency*, 942 F.3d at 1092. Through an agent, the CVP in turn sells that power to cities and other purchasers ("power customers"). *Id.* Plaintiffs here are governmental entities that purchase hydroelectric power produced by the CVP. (Am. Compl. at 6–8, ECF No. 35). In addition to paying for the water and power they receive, the rates charged to water and power customers reimburse Reclamation for the proportionally allocated costs of building, operating, and maintaining the CVP. *N. Cal. Power Agency*, 942 F.3d at 1092. Water customers are responsible for roughly seventy-five percent of those costs and power customers are responsible for the remaining quarter. *Id.* Those allocations are intended to reflect relative benefits that customers derive from the CVP, a water-focused operation. *Id.*

The CVPIA established a "Restoration Fund" to pay for fish and wildlife habitat restoration, among other things, and authorized up to $50 million per year to be dedicated to restoration goals. CVPIA § 3407(b). To replenish the money in the Restoration Fund, the CVPIA requires the United States to collect certain payments from purchasers of CVP water and purchasers of hydroelectric power, such as NCPA. § 3407(c)(2). The payments—called Mitigation and Restoration ("M&R") payments—help fund efforts to mitigate the CVP's environmental impact. *N. Cal. Power Agency*, 942 F.3d at 1093. M&R payments are distinct from water and power contractors' obligations to reimburse the United States for a portion of CVP's capital costs and operations and maintenance expenses. *Id.*

Reclamation is subject to five limitations for fund collection. First, the CVPIA limits M&R payments the United States may collect to $30 million on a three-year rolling average. CVPIA § 3407(d)(2)(A). Second, payments assessed against CVP water customers cannot exceed $6.00 per acre-foot, adjusted for inflation, for agricultural water and $12.00 per acre-foot, adjusted for inflation, for municipal and industrial water. § 3407(d)(2)(A). Third, Reclamation is required to reduce the additional annual M&R payments imposed on CVP customers who use the water for agricultural purposes by accounting for their ability to pay for such charges. §

3407(d)(2)(A). Fourth, Reclamation is required to reduce the annual ceiling for additional annual M&R payments to $15 million once it completes the fish, wildlife, and habitation mitigation and restoration actions specified in Section 3406 of the Act. § 3407(d)(2)(A). Finally, the CVPIA requires Reclamation to consider proportionality between water and power customers, stating: "[t]he amount of the [M&R] payment made by [CVP] water and power users, taking into account all funds collected under this title, shall, to the greatest degree practicable, be assessed in the same proportion, measured over a ten-year rolling average, as water and power users' respective allocations for repayment of the [CVP]." § 3407(d)(2)(A). It is the final provision that was at issue at the liability stage of this case.

Through its collection attempts since the CVPIA's enactment, Reclamation sought to maximize revenue from the annual M&R payments by seeking to collect the statutory cap of $30 million from both water and power users. Reclamation did not consider the proportionality requirement in assessing costs to NCPA, instead calculating the difference between what it expected to receive from water customers and the $30 million cap, and then charging NCPA for the anticipated shortfall. *N. Cal. Power Agency*, 942 F.3d at 1095. With California's severe drought and dwindling water deliveries, Reclamation required power customers to pay approximately 40.5 percent of the $30 million M&R cap. (Am. Compl. at 5). This is significantly more than their proportional benefit, thereby imposing a financial burden more than 50% higher than the Congressionally-mandated "fair share" attributable to CVP power customers. (*Id.*). NCPA brought this suit for reimbursement of M&R payments assessed in violation of the Section 3407(d) proportionality provision.

At trial, the Court found that the "proportionality" requirement was not a "limitation" within the meaning of Section 3407(c)(2) and thus could not take precedence over the Restoration Fund's $50 million annual collection goal outlined in Section 3407(c)(2). *N. Cal. Power Agency*, 139 Fed. Cl. at 76. The Federal Circuit reversed, adhering to the plain meaning of the statute. The Circuit found that the requirement that Section 3407(d) M&R payments "shall, to the greatest degree practicable, be assessed in the same proportion . . . as water and power users' respective allocations for repayment" was in fact a "limitation" and, when unfollowed, resulted in overpayments. *N. Cal. Power Agency*, 942 F.3d at 1098–99. Accordingly, NCPA is entitled to reimbursement of M&R payments improperly assessed and collected by Reclamation in violation of the Section 3407(d) proportionality provision.

## II.   Discussion

Based on the Federal Circuit's finding, there is no dispute that Reclamation imposed disproportionate charges on NCPA constituting an illegal exaction for which the United States must pay damages. The trial court held that "[i]f the Government violated the proportionality requirement in Section 3407(d), by necessary implication, the remedy would be a return of the illegal and disproportionate payments that it assessed upon Plaintiffs." *N. Cal. Power Agency*, 122 Fed. Cl. 74, 113 (2018). That holding remains undisturbed. The lingering issue is the computation of that reimbursement. NCPA and the United States both move for summary judgment arguing that their methodology is the correct one. Based on the reasoning outlined below, the Court agrees with NCPA.

   A. *Motions for Summary Judgment*

Before analyzing the divergence of formulas, the Court notes the parties' agreement on various points of calculation, including the arithmetic and basic spreadsheet formulas that should be used. (Def.'s Mot. Summ. J. A160). Both parties first compute the proportional charges for all power contractors, compare those amounts to the actual amounts paid by all power contractors, and then compute the NCPA's shares of the totals. (Nov. 1, 2021 Status Report at 6). To that end, the amount of NCPA's proportional M&R payment responsibility is computed according to the following formula:

**Power M&R = (Water CVPIA Receipts / Water CVP Repayment %) x Power CVP Repayment %**

(*Id.*).[2] The Court accepts this jointly proposed formula. In it, the "Power M&R" and "Water CVPIA Receipts" terms are annual amounts corresponding to a single fiscal year. (*Id.*). The terms "Water CVP Repayment %" and "Power CVP Repayment %" reflect each group's average share of CVP repayment allocation measured over rolling ten-year periods. (*Id.*). The percentages reflect the power and water users' respective allocation for repayment of CVP capital costs, exclusive of operations and maintenance expenses. (*Id.*). However, despite various points of agreement on how those numbers should be interpreted, the parties' damages calculations use different CVP repayment percentages.[3] (*Id.*).

The dispute is narrow: what proportionality ratio should Reclamation use to determine charges during 2008–2020? Resolution depends on whether damages should be calculated using the cost allocations and practices that were in effect during the damages period as NCPA contends or based on retroactive changes made, as the United States believes, in attempt to comply with the CVPIA.[4]

---

[2] In this formula, "Plaintiffs do not dispute the amounts of "Water CVPIA Receipts" that the Government says were collected in each fiscal year." (Nov. 1, 2021 Status Report at 7).

[3] There is some question as to whether the calculation should be staggered by two years. The United States proposes to calculate damages by implementing this formula on a lagged basis so that power contractors' M&R payments for a given year are proportional to water users' CVPIA payments two years earlier. (Nov. 1, 2021 Status Report at 8). NCPA calculates damages by applying this formula on a current-year basis so that power contractors' payments are proportional to water users' payments for the same fiscal year. (*Id.*). NCPA admits that calculations using the two-year lag actually results in a higher computation of damages; that said, the Court reserves ruling on whether the two-year lag is appropriate. The Court notes that NCPA advocates for calculation on a current-year basis and acknowledged that, by calculating damages on a current-year basis, they forfeit the higher amount in damages. (Tr. of Oral Arg. at 63:15–17, ECF No. 167).

[4] The Court acknowledges that this methodology must be new because proportionality was not being calculated prior to the Federal Circuit's 2019 decision. Thus, "practices in effect" during the damages period refers to the same factors in cost allocation, not necessarily the same formula.

      i.  United States' Position

For decades, Reclamation improperly "prioritized" the collection of $50 million over the statutory directive that CVP water and power users pay in proportion to their respective repayment allocations. (Def.'s Mot. Summ. J. at 9). The United States has unilaterally determined that defiance of the proportionality requirement was not its only error in collection. After internal analysis, Reclamation now "takes a different position with respect to whether certain [underlying] costs should be included or excluded from the proportionality calculation." (*Id.* A0167). Originally, Reclamation included costs of water distribution systems in CVP repayment. The Court determined the United States was liable to NCPA in November 2019. In January of 2020,[5] the United States determined that inclusion of distribution costs was in error because they are "non-CVP" costs, reasoning that water distribution system costs relate only to single contracting entities and are not shared by CVP beneficiaries. (*Id.* at 5). The United States claims that because the CVPIA does not authorize inclusion of non-CVP costs in calculating the proportionality assessment, water distribution system costs may not be included in calculating damages owed in this case. (*Id.*).

In support of excluding costs that are not shared by all CVP beneficiaries, the United States cites the position advocated by the "Commissioner of Reclamation"[6] in 1946—more than seventy years prior to its January 2020 implementation. At that point, the Acting Secretary of Interior authored a letter to Congress regarding the proper allocation of CVP costs, that distinguished "between the central features of the project[,] which will provide common services, and the irrigation water distribution systems [that] serve a single contracting unit."[7] (Def.'s Mot. Summ. J. A543). The letter emphasized that "[w]hatever supplementary distribution systems for irrigation water are necessary or desirable under the requirements of the reclamation law will be the subject of individual and separate repayment contracts . . . and will have no direct relationship to the central operation, control, and financial accounting of the [CVP]." (*Id.*). By contrast, "[t]he contractual terms under which project water is furnished will both reflect and form a part of the financial structure and operational arrangements of the central group of common features [that] provide the project supply of water (and power)." (*Id.*).

Despite the 1946 letter, not only did Congress refuse to formally adopt that approach, but Reclamation's policy continued to include water distribution costs in its interim CVP cost allocation until 2020.[8] For the entire damages period in this case, cost allocations were governed

---

[5] The United States asserts that this decision was the result of a cost allocation study that began in 2010. (Tr. of Oral Arg. at 31:22, ECF No. 167).

[6] The author of this letter is misidentified in the United States' briefing—it is from Oscar Chapman, Acting Secretary of Interior in 1947. (Def.'s Mot. Summ. J. A534).

[7] Whether that letter was ever actually provided to Congress is not apparent from the record. The Court will assume for purposes of this Opinion that it was received.

[8] The United States asserts that this practice was followed in the 50's and 60's, but there is no evidence of that in the record. (*See* Tr. of Oral Arg. 47:9–21).

by a study issued by Reclamation in 1970 and updated in 1975. (*See* Pl.'s Mot. Summ. J. A0273). Those analyses perpetuated inclusion of water distribution costs despite the decades old letter.

In 1986, Congress directed Reclamation to prepare a new cost allocation study ("CAS") by 1988; it failed to do so. (Pl.'s Mot. Summ. J. A0267 (observing that "[n]o major reallocation of CVP costs has been completed since 1975.")). Had Reclamation wanted, it could have differentiated between cost allocations for central features of the CVP and water distribution system costs relating only to a single contracting entity not shared by CVP beneficiaries. By ignoring Congress, Reclamation again failed to draw the distinction that the United States presses the Court to draw now. No final CAS was completed until 2020, (Tr. of Oral Arg. 22:14–16), thereby denying Congress the chance to review the practical effects of the CVPIA. In 1993, Reclamation issued "revised interim guidelines interpreting the statutory obligations under the CVPIA," which apparently excludes water distribution system costs, but that was not implemented on the ground. (Def.'s Mot. Summ. J. A0063).

Again in 2001, Reclamation considered and rejected proposed changes to the existing allocations which lumped all water distribution customers together. (Pl.'s Mot. Summ. J. A0296, A0300, A0334). The 2001 report "examined various cost allocation methods" and decided that "the existing methodology would remain in place." (*Id.* A0414). It was not until January 6, 2020, almost two months after the Federal Circuit decided liability, that Reclamation issued a Final CAS explaining a new methodology and establishing the final cost allocation factors. (Def.'s Mot. Summ. J. at 5; Pl.'s Mot. Summ. J. A0387–88; Tr. of Oral Arg. 31:5). This stratagem conveniently reduces the damages owed to NCPA by several million dollars.

Simply put, the United States calculates these charges differently now than it would have calculated them had it treated proportionality as binding during the relevant time frame. The United States' Motion is premised on the notion that it should not be forced to repeat its long-committed error. Based on these revelations, the United States asks the Court to adopt the damage calculation excluding water distribution system costs (like those in San Felipe), which it believes is consistent with Section 3407(d) of the CVPIA by "exclud[ing] costs that are not allocated for repayment of the CVP." (Def.'s Mot. Summ. J. at 1–2). Implementing this calculation would award NCPA $68,154,911. (*Id.* at 13).

    ii. <u>NCPA's Position</u>

NCPA disagrees with the United States' approach and ask that the Court implement the decades-long allocation calculation utilized by Reclamation. NCPA contends that the disconnect is that the United States' damage calculation modifies cost allocations "retroactively," thereby increasing by roughly 25 percent the Government's estimate of what NCPA should have paid. (Pl.'s Mot. Summ. J. at 4). NCPA believes that applying a retroactive change contravenes the proper methodology of damages in illegal exaction cases.

NCPA cites reliance on the United States' litigation position at the liability stage. During the 2018 trial, the parties introduced a joint exhibit comparing, on a ten-year rolling average basis, power and water users' relative M&R payments and respective allocations for CVP repayment. (Pls.' Mot. Summ. J. A0027 ("Joint Ex. 2")). At trial, a witness for the United States

7

agreed that this exhibit represented "the ten-year rolling average assessment of collections and repayment allocation[s]," and iterated "that's what the restoration fund says in terms of how the repayment allocation should be measured for proportionality if they're on the ten-year rolling average basis." (*Id.* A0032–33). Joint Exhibit 2 included allocations and percentages through fiscal year 2015. (Joint Ex. 2).

NCPA contends that the calculation of its proportional share of CVP payments should be based on the cost allocations in effect when the disproportionate charges were rendered. (*See* Tr. Oral Arg. 8:23–9:4 (Counsel for NCPA: "It's undisputed that Joint Exhibit 2 reflected the historical allocations and included the distribution systems in the San Felipe facilities. The government consented to the admission into evidence of Joint Exhibit 2 without qualification or limitation, and under this Court's precedent, such a joint submission is a binding admission of the facts set forth therein.")). Those allocations are shown in Joint Exhibit 2 and Defendant's response to NCPA's Interrogatory 25. (Pl.'s Mot. Summ. J. at 13; *see also id.* A0028). NCPA's expert relied on those historical allocations and percentages to project what the United States would have charged during the damages period but for its failure to treat proportionality as binding. (*Id.* A0047–48, A0050).

Based on these arguments, NCPA asks the Court to rule that damages in this case are equal to the difference between the charges imposed on NCPA for fiscal years 2008 through 2020 and the charges Reclamation should have imposed but for its illegal exactions, measured as of the time of the exactions using the CVP cost allocations and methods then in place. (Pls.' Mot. Summ. J. at 5, 24). This calculation results in a damage award of $81,872,385. (*Id.* at 5 n.1).

### B. NCPA's methodology is correct under basic premise of "damages."

An illegal exaction claim under the Tucker Act is "a non-tortious, non-contractual claim for money damages." *Perry v. United States*, 149 Fed. Cl. 1, 25 (2020) (quoting *Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273–74 (2012)). The parties agree that damages in this case are the difference between what the United States actually charged NCPA and the proportional amount of M&R payments for the damages period during fiscal years 2008–2020. Theoretically, damage calculation should be simple. For illegal exactions, however, there is no clear-cut methodology. "Once an illegal exaction is established, almost no cases discuss how to calculate damages." Renee Burbank, *Illegal Exactions* 87 Ten. L. Rev. 315, 343 (2020). This is largely because illegal exactions of money result in a certain and identifiable sum that must be returned. However, this case presents an atypical scenario: the United States attempts to redefine the formula post-exaction, akin to switching a basketball for a volleyball in the fourth quarter.

The United States posits that Reclamation's prior long-standing practice was flawed and urges the Court to adopt a process considered, but not adopted, by Reclamation more than 70 years ago, and only now reinvigorated. NCPA argues that measuring economic damages requires asking what financial position a plaintiff would have been in "but for" the unlawful government action. (Tr. Oral. Arg. at 18:31–20); *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014). The "but-for scenario" is "the standard general approach to damages quantification." Mark A. Allen, et al., *Reference Guide on Economic Damages*, in *Reference Manual on Scientific Evidence*, 425, 429 (Fed. Judicial Ctr., 3d ed. 2011). Balancing a "but-for" analysis with the facts of this case, the Court must decide if the correct calculation should

include costs actually used during the relevant time frame or if it should implement the formula Reclamation now claims it "should have" used. The difficulty in doing so arises from historical inconsistencies in Reclamation's approach to cost allocation. Reclamation had years—decades, even—to implement this new approach or to invite congressional input on the matter but chose not to do so until after the Circuit ascribed liability.

The initial allocation occurred at the start of the CVP in 1946. The 1970 and 1975 studies support NCPA's current argument for damages as including water distribution systems, like those in San Felipe, in reimbursable costs subject to repayment by beneficiaries of the CVP. In 1988, Congress directed Reclamation to conduct a new CAS. Again, Reclamation failed to do so until over 30 years later and following the Circuit's decision imposing liability on Reclamation for overcharging NCPA. In the interim, between the 1988 Congressional directive and Reclamation's 2020 Final CAS, Reclamation perpetuated the existing cost allocation methodology reflected in the 1970 and 1975 studies. A multi-decade practice makes for a vehement endorsement. The result: for over seventy years, Reclamation utilized a methodology that NCPA urges the Court to adopt as the measure of damages. An agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n.30, (1987); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994). Here, Reclamation's actions over seven decades more than compellingly demonstrates a "consistently held agency view" which NCPA and the Court are entitled to rely on.

The United States is unswayed by NCPA's reliance on Joint Exhibit 2. It argues that this exhibit repeats the 1975 study's error which has now been corrected, thus it does not represent the "allocated" costs of repayment of the CVP, nor does it apply the specific policy guidance in place at the time—the 1993 Revised Interim Guidelines. (Def.'s Mot. Summ. J. A63). But the trouble with that contention is that Joint Exhibit 2 is based on the publicly available cost allocations relied on by customers *and* Reclamation for decades. Further, it accurately reflects the United States' trial position. In now straying from the approach outlined in Joint Exhibit 2, the United States has changed its litigation position at the eleventh hour.

The United States maintains that the Court should overlook Reclamation's pivot because "the trial was only about liability." (Tr. Oral. Arg. 23:24–25). While the Court understands the implications of bifurcation, the Federal Circuit has upheld an order precluding discovery related to damages in an illegal exaction case because prior audits by the Government properly served as the basis for the damages calculation and where it had not raised a counterclaim or setoff defense. *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1307 (Fed. Cir. 2008) (rejecting government claim it should not be bound by prior audits absent showing it possesses concrete evidence, as opposed to theoretical argument, that adjustment in government's favor would result); *see also Sara Lee Corp. v. United States,* 29 Fed. Cl. 330, 338 (1993); *Missouri Pac. R.R. v. United States,* 168 Ct. Cl. 86 (1964). This Court finds that Reclamation's change in position is not a basis for the United States to modify damage calculation when it had the opportunity to raise these concerns for years before.

Historical allocations, as well as CVP repayment rates and charges based on those ten-year allocations, included the relevant costs. No United States' expert contends that, had Reclamation implemented proportionality during the damages period, it would have done so as

Reclamation does now, subtracting the distribution system and out-of-basin costs. Further, Reclamation has not attempted to formally revise those allocations and rates retroactively for any purpose other than its damages calculations here. (Pl.'s Mot. Summ. J. A579–580; *see also* Tr. Oral Arg. 54:19–55:1 ("Yes, there's no question that there are other entities that would have forced exactions pursuant to this old formula for calculating mitigation and restoration charges, including water contractors who actually weren't a part of the suit[.]"), 57:21–23 ("I'm not aware of Reclamation reaching out to non-plaintiffs regarding the issues in this case.")). In other words, except for the named plaintiffs here, Reclamation does not intend to return improperly exacted funds to its other customers. The resulting manifest unfairness is palpable.

The United States is a litigious country. When a wrong has been committed, whether it be contractual or through illegal exaction, the basic principle underlying damages is compensation for losses sustained and no more. Damages are not recoverable for losses beyond an amount the evidence establishes with reasonable certainty. *See Phillips & Jordan, Inc. v. United States*, 158 Fed. Cl. 313, 332 (2022) (holding that damages must be shown with reasonable certainty or approximation). If the goalposts are constantly moving—i.e., calculations changing retroactively—it would be inequitable to require plaintiffs to show damages with any degree of certainty. How could they? How could courts? The Court therefore finds that the revisionist scheme advocated by the United States in this case violates the basic canons of damage calculation. NCPA's reliance on the CVP cost allocation amounts and percentages shown in Joint Exhibit 2 and the United States' discovery responses is sufficient to carry their burden to compute but-for charges and damages with reasonable certainty. NCPA's proposed methodology follows the but-for causation necessary in illegal exaction cases and is the proper calculation for that reason. The Court turns to whether exclusion of these costs is mandated by the CVPIA.

### C. *NCPA's methodology is correct under the plain meaning of the statute.*

Putting aside principles of damage calculation, the Court finds that the plain language of the CVPIA does not classify water distribution systems and out-of-basin expenditures as non-CVP costs. Likewise, it does not explicitly mandate exclusion of those costs for purposes of the Restoration Fund. The agency is free to interpret it that way and make that change going forward, but retroactive application is certainly not mandated by the statute.

The United States urges the Court to "view this issue through the lens of what does that statutory provision mean." (Tr. Oral. Arg. 49:8–9). The starting point for interpreting a statute is the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* "To ascertain whether Congress had an intention on the precise question at issue, [courts] employ the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). The Court does not interpret the statute in a vacuum and "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme." *Barela v. Shinseki*, 584 F.3d 1379, 1383 (Fed. Cir. 2009) (citation omitted). A statute's meaning, regardless of whether the language is plain or not, depends on the context. *Id.* (citation omitted). While the Court may look to context to understand the meaning of a statute, it does not look beyond "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The question is not, as the United States suggests, "whose interpretation is

more reasonable and who has a more robust interpretation." (Tr. Oral Arg. 27:6–8). Instead, the question is what the statute explicitly states.

The language of Section 3407(d) is plain. The relevant portion of Section 3407(d)(2)(A)—i.e., the provision to which the Federal Circuit directed this Court to adhere—states: "[t]he amount of the mitigation and restoration payment made by Central Valley Project water and power users, taking into account *all funds collected under this title*, shall, to the greatest degree practicable, be assessed in the same proportion, *measured over a ten-year rolling average*, as water and power users' respective allocations for repayment of the Central Valley Project." CVPIA § 3407(d)(2)(A) (emphasis added). On a very basic level, this controlling language places importance on the proportional payments being an average measured for the same period of time. Thus, changing what constitutes CVP costs at this juncture would necessarily alter the measuring stick in direct contravention of the statute.

Further, Congress directed Reclamation to allocate M&R payments by accounting for "all" funds collected pursuant to the CVP. Congress made no distinctions, operationally or financially, between the types of projects within the CVP. *See* CVPIA § 3403(d) (defining the CVP as including all reclamation projects located within or diverting water from Sacramento and San Joaquin river watersheds). The United States recites the proposition that the "CVP's defining feature is the fact that it is a financially and operationally integrated multipurpose water project." (Def.'s Mot. Summ. J. at 16 (internal citations omitted)). Despite the integrated nature of the CVP, Reclamation seeks to distinguish between the integration of the CVP for the central feature. (Def.'s Mot. Summ. J. at 17). This distinction arises from differences in operational structure and financial integration. (*Id.* at 17–18).

The responsibilities of the integrated components of the CVP are reflected in written agreements outlining each component's "obligations, goals, and expectations." (*Id.* at 17). By contrast, Reclamation claims, the operation of water distribution systems is the responsibility of each water distribution system customer pursuant to a separate contract. (*Id.*). In other words, water distribution systems serve only a single customer, while the integrated components of the CVP benefit the entire project. Reclamation highlights a provision of a 1988 rate-setting document which provides: "[t]he costs of isolated or out-of-basin facilities are the direct repayment responsibility of the contractor (or group of contractors) who benefit from the services provided by the facilities." (Def.'s Mot. Summ. J. A594). Leaving aside whether "isolated or out-of-basin" is used interchangeably with water distribution systems, this provision—again, one never formally adopted by Reclamation—does not necessarily mean that costs borne solely by water distribution system customers pursuant to individual specific contracts can be properly severed from total costs subject to the proportionality requirement of Section 3407(d). The CVPIA suggests otherwise.

Indeed, payment for CVP water occurs pursuant to the same statute which sets forth two methods of repayment by water customers. 43 U.S.C. § 485h. First, a customer may enter into a repayment contract over a period regardless of the quantity of water delivered. 43 U.S.C. § 485h(d). Second, a customer may enter into contracts with Reclamation for irrigation water payable in advance each year of the contract. 43 U.S.C. § 485h(e). Importantly, both payment methods, regardless of the type of customer, are covered under Title 43. (*See* Tr. Oral Arg. 41:3–8 ("I generally agree with what plaintiffs' counsel said that insofar as under 9(c) of the

Reclamation Act of '39, . . . the water service contracts provides for the provision of water service contracts, and under 9(d) of that same statute you have the relevant service contracts.")).

The United States argues that operationally, water distribution system customers and the "integrated operations" of the CVP are separate and distinct. (Def.'s Mot. Summ. J. at 17–18). Integrated CVP operations are prescribed through a "Coordination Operations Agreement" outlining the project's obligations, goals, and expectations while the operation of water distribution systems is controlled by individual contracts. (*Id.* A003–33). Though fundamental operational distinctions may exist between the two classes of CVP customers, Congress was explicit: M&R repayment must account for *all* funds collected by Reclamation from water and power customers regardless of operational distinctions. *See* CVPIA § 3407(d)(2)(A).

Moreover, Congress's expansive inclusion of "any reclamation or irrigation project, including incidental features thereof, . . . constructed by the United States pursuant to said laws, or in connection with which there is a repayment contract" within the meaning of the term "project" undercuts Reclamation's contention that water distribution systems are not integrated within the CVP. *Cf.* 43 U.S.C. § 485a(c) (defining "project") and (e) (defining "repayment contract"). The statutory scheme evidences no Congressional intent to sanction a system of abstract peculiarities among those customers in order to artificially exclude water distribution systems from other CVP projects for M&R repayment purposes. Certainly, Reclamation may, within the agency and after providing due notice to its customers, implement such a distinction. But it must also take clear agency action that adopts that interpretation. Deeds done are more meaningful than words said. An agency's interpretation only receives deference if it is adopted through procedures with some formality. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Without this level of formality, agencies could implement policies chaotically, unbeknownst to consumers, or in the face of litigation in order to shield themselves from additional liability. The result is impractical and unfavorable.

In its opinion reversing the trial court, the Federal Circuit emphasized the "oft-repeated warning that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *N. Cal. Power Agency*, 942 F.3d at 1098 (quoting *Consumer Prod. Safety Comm'n*, 447 U.S. at 117). This observation is equally valid when applied to the context of agency action. It is an admonition the United States disregards. The Federal Circuit's 2019 admonition, applied here to an agency rather than Congress, foreshadows the result of this litigation. *See N. Cal. Power Agency*, 942 F.3d at 1098. Simply put, the widely dispersed brackets designated by Reclamation are not compelling. On one end, Reclamation features a single letter from 1947 describing an intent to treat single-use CVP components differently from common features of the CVP—an intent never practiced. Reclamation shores up this disused notion decades later and only post-appeal with a Final CAS, which incidentally decreases Reclamation's exposure. Interspersed between these far-flung events, is the reality in which Reclamation calculated payments by the method now pressed by NCPA. The Court chooses to value Reclamation's deeds over mere words.

Reclamation correctly frames the difference between its calculations and those of NCPA as almost entirely dependent on whether water distribution costs should be included in determining if NCPA's M&R payments were proportional to their respective allocations for repayment of the CVP. (Def.'s Mot. Summ. J. at 12, 15). In seeking to minimize its exposure,

Reclamation improperly construes the nature of the CVP and the statutory language of the CVPIA; it ignores Reclamation's longstanding real-world approach in favor of a belated distinction not adopted by the agency, and certainly not Congress, until remand following the determination of liability. NCPA's proposed methodology, on the other hand, comports with the statutory language of the CVPIA and the long-implemented practice of Reclamation.

### III. Conclusion

The Court finds that the United States' post hoc rationalization—that reimbursable percentages used for CVPIA calculations should not consider individual water contractors—is improper given Reclamation's multi-decade reliance on the inclusion of those costs and the relevant statutory language. Therefore, the Court finds that NCPA's proposed methodology is sound and should be implemented to calculate damages here.

NCPA's Motion for Summary Judgment, (ECF No. 152), is **GRANTED** and the United States' Motion for Summary Judgment, (ECF No. 153), is **DENIED**. In light of this Opinion, the parties are directed to meet and confer to complete the relevant calculations. On or before September 20, 2022 the parties are directed to file a Joint Status Report apprising the Court of their progress and whether further litigation remains necessary.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge